UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DIANE PENNINGTON, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
v.                                 )          No.: 1:19-cv-00796-JEB
                                   )
ISLAMIC REPUBLIC OF IRAN,          )
                                   )
            Defendant.             )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR DEFAULT**

**JUDGMENT AS TO DAMAGES PURSUANT TO FRCP 55(b)(2)**

## I.      INTRODUCTION

In its Memorandum Opinion granting Plaintiffs' Motion for Default Judgment as to

Liability, this Court determined that Plaintiffs have established their liability claims "by evidence

satisfactory to the court," pursuant to 28 U.S.C. § 1608(e). *See* ECF 49 (Memorandum of

Opinion). Plaintiffs come now to seek default judgment as to the amount of damages owed by

Defendant.

## II.      STANDARD OF REVIEW

In evaluating the Plaintiffs' proof of economic damages, the Court may "accept as true

the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97,

100 (D.D.C. 2000); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 268 (D.D.C.

2003). Further, Plaintiffs may establish proof of damages by affidavit. *Weinstein, v. Islamic

Republic of Iran,* 184 F.Supp.2d 13, 19 (D.D.C. 2002). Additionally, "FSIA courts may 'take

judicial notice of related  proceedings and records'" *Haim v. Islamic Republic of Iran,* 784

F.Supp.2d 1, 6, quoting *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 59 (D.D.C. 2010).

Damages available under the FSIA-created cause of action include "economic damages,

solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Many courts have

previously assessed these same types of damages against both sovereign and non-sovereign

defendants where liability has been established based on the FSIA or common law tort claims.

*See, e.g. Murphy v. Islamic Republic of Iran,* 740 F.Supp.2d 51 (D.D.C. 2010). Immediate family

members of the deceased and surviving victims can recover solatium for their emotional injuries.

*See id.*; *Valore*, *supra*, 700 F. Supp. 2d 52; *Est. of Heiser v. Islamic Republic of Iran*, 466 F.

Supp. 2d 229 (D.D.C. 2006); *Bova v. Islamic Republic of Iran*, 15-CV-1074 (RCL), 2020 WL

2838582, at *6 (D.D.C. May 31, 2020). Surviving victims and estates of deceased victims can

also recover economic damages as well as damages for the intense pain and suffering endured as

a result of the attack. *Murphy*, 740 F. Supp. 2d at 78. Finally, all plaintiffs bringing an FSIA

claim are also entitled to punitive damages and prejudgment interest. *Id.* at 76-78; *Baker v.*

*Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 84-87 (D.D.C. 2011).

### III.   DAMAGES AVAILABLE TO FAMILY MEMBERS OF DECEASED OR INJURED SERVICEMEMBERS

#### A.   Solatium of Family Members

Almost all Plaintiffs in this action are family members of U.S. Servicemembers who were

attacked using an EFP or IED device. These Plaintiffs are entitled to recover compensatory

damages for solatium. "A claim of solatium is a claim for the mental anguish, bereavement and

grief that those with a close personal relationship to a decedent experience as the result of the

decedent's death, as well as the harm caused by the loss of the decedent, society and comfort."

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

To determine the amount of solatium damages to award family members of victims,

courts examine "the 'nature of the relationship' between the family member and victim, and 'the

severity of the pain suffered by the family member." *Est. of Heiser v. Islamic Republic of Iran*,

466 F. Supp. 2d 229, 269 (D.D.C. 2006). Courts also look to prior decisions awarding damages

for solatium in determining the appropriate amount of compensatory damages. *Baker*, 775 F.

Supp. 2d at 83. Prior cases have established a guiding framework for determination of the

appropriate damages for family members of victims. *Valore*, 700 F.Supp.2d at 85; *Belkin*, 667

F.Supp.2d at 23. Under this framework, "[s]pouses typically receive greater damage awards than

parents, who, in turn, receive greater awards than siblings." *Heiser*, 466 F. Supp. 2d at 269. In

addition, "families of victims who have died are typically awarded greater damages than families

of victims who remain alive." *Id.* (internal quotations and citations omitted).

Plaintiffs request that this Court adopt the below framework for determining solatium damages in this case:

| Plaintiff's Relationship to Servicemember | Deceased Servicemember | Surviving Servicemember |
|---|---|---|
| **Spouse** | $ 8 million | $ 4 million |
| **Parent** | $ 5 million | $ 2.5 million |
| **Sibling** | $ 2.5 million | $ 1.25 million |
| **Child** | $ 3 million | $ 1.5 million |

*Valore*, 700 F. Supp. 2d at 85; *Heiser*, 466 F. Supp. 2d at 269; *Bova*, 15-CV-1074 (RCL), 2020 WL 2838582, at *6. The above solatium framework has been repeatedly upheld and utilized by courts for cases involving the bombing of U.S. Servicemembers abroad (such as in the Beirut Barracks attack in 1983, *see Valore* and *Bova supra*; and the bombing attack on U.S. Military Base living quarters in Saudi Arabia, *see Heiser supra*). The circumstances of the family member plaintiffs in those overseas bombings cases are similar factually to the circumstances of the family member Plaintiffs in this case. As such, Plaintiffs propose that the Court apply this same solatium framework to the award calculations in this case.

## B.  Justification for Upward Departures

The above solatium framework, however, is "not set in stone." *Baker*, 775 F. Supp. 2d at 83. Courts allow for upward or downward departures from this solatium framework as supported by each plaintiff's circumstances and evidence. *Id.* Upward departures are appropriate where there generally are aggravating circumstances, including for example self-destructive behavior or a need for psychiatric treatment after the incident indicating a particularly powerful feeling of loss. *Id.* Conversely, "there may be circumstances where a downward departure is appropriate, as when the relationship between the decedent and claimant is more attenuated." *Id.* For several Plaintiffs in this action, there is evidence and circumstances for which an upward departure from the above listed solatium framework is requested.

### 1. Plaintiffs Monique Shantel Green Richard, Corey Schenker, and LaNita Herlem

Plaintiffs Monique Shantel Green Richard, Corey Schenker, and LaNita Herlem request an upward adjustment based on their circumstances. Each of these three plaintiffs have suffered not only the loss of their husbands, but also the loss of being able to have children due to the Defendant's wrongful conduct. Plaintiff Green Richard and her husband, Sergeant Joseph Richard, III ("Sgt. Richard"), wanted to have children and they were trying to do so before his final deployment. *See* Declaration of Daniel Alberstone ("Alberstone Decl."), Exhibit 13(a). Because Sgt. Richard was killed, Ms. Green Richard was not able to share in the joy of forming a family with her husband, who she believed would have been an excellent father. *Id.* Plaintiff Schenker and her husband, Privat First Class William Thorne ("PFC Thorne"), were planning to adopt a child together after his initial term was finished. Alberstone Decl., Exhibit 16(a). However, those plans were cut short when her husband was killed as a result of Defendant's conduct. Finally, Plaintiff Herlem and her husband, Sergeant First Class Bryant Herlem ("SFC Herlem"), had been attempting to start a family before he was killed and even if they were not able to have their own child, they planned to adopt. Alberstone Decl., Exhibit 10(a). Once SFC Herlem died, Plaintiff Herlem knew that she had also lost her chance to have children. *Id.*

Because Plaintiff Green Richard, Plaintiff Schenker, and Plaintiff Herlem lost not only their spouses, but also their ability to have a family with their respective spouses, these plaintiffs each request an upward adjustment of $2,000,000, which is 25% of the spousal award for deceased servicemembers. *See Valore* , *supra*, 700 F. Supp. 2d at 86 (allowing upward adjustments of 25% of the baseline award for various solatium plaintiffs).

### 2.   Plaintiff Rachel Lambright

Plaintiff Rachel Lambright requests an upward adjustment for the emotional harm she suffered as a result of the injuries sustained by Specialist Jerral Hancock ("SPC Hancock").[1] At the time Jerral Hancock was injured by the EFP blast, Plaintiff Lambright was his spouse. Alberstone Decl., Exhibit 9(b). As a result of SPC Hancock's PTSD and injuries, their marriage began to suffer. *Id.* Plaintiff Lambright at one point was experiencing back pain and began taking some of the pain medicine that had been prescribed to SPC Hancock. *Id.* Plaintiff Lambright found that these pain killers not only numbed the pain of her back, but also "everything happening to [Jerral] and our family." *Id.* Eventually she developed an addiction, which contributed to her divorce with SPC Hancock. *Id.* However, "the beginning of the end of [their] relationship was the EFP attack." *Id.* The resulting addiction and the divorce sent Plaintiff Lambright into a downward spiral that resulted in losing custody of her children and being homeless for a period of time. *Id.* She was finally able to get back on her feet, but the EFP attack took much from Plaintiff Lambright. *Id.*

Because of the devastating effects that the EFP and SPC Hancock's resulting injuries left on Plaintiff Lambright, she requests an upward adjustment of $1,000,000, which is 25% of the spousal award for injured servicemembers. *See Bova*, 15-CV-1074 (RCL), 2020 WL 2838582, at *9 (allowing a $1 million upward departure for a mother who showed evidence of a deteriorating metal state due to the loss of her son including the fact that she turned to alcohol and entered a series of abusive and threatening relationships.)

---

[1] Jerral Hancock is not asserting personal injury claims in this case. He is asserting his own personal injury claims in a separate case pending in the D.C. District Court.

### 3.     Plaintiff Diane Pennington & D. Allen

Plaintiff Diane Pennington, individually and on behalf of minor D. Allen, is requesting an upward adjustment due to the distressing circumstances of her brother Howard Allen's death. Plaintiff Pennington assumed guardianship of Mr. Allen's son (D. Allen) and is also bringing claims on his behalf. Alberstone Decl., Exhibit 4(a). After the attack, one of Mr. Allen's fellow soldiers who witnessed the attack reported that the person who detonated the EFP device was dancing as the bomb went off. *Id.* Plaintiff Pennington and her family were incredibly distressed to learn this fact and have been burdened with that knowledge and visual ever since.

Given that she and D. Allen must live with this horrifying knowledge, Plaintiff Pennington is requesting an upward adjustment of $500,000 for her individually as well as Plaintiff D. Allen. Courts have repeatedly held that claims for solatium damages are indistinguishable from claims for infliction of intentional emotional distress and the court may award a greater amount where there are "aggravating circumstances." *Valore* , *supra*, 700 F. Supp. 2d at 886. As such, Plaintiff Pennington requests that the court consider the above circumstances qualify as an appropriate basis for an upward adjustment from the baseline award because the attacker's actions show a intent to cause distress.

### 4.     Plaintiff Taylor Brown

Plaintiff Taylor Brown seeks an upward adjustment for solatium damages due to the devastating effects his father Sergeant First Class Scott Brown's death had on his family. Plaintiff Brown was an only child and he was in the 5th Grade when his father was killed by an EFP. Alberstone Decl., Ex. 5(a). After his father's death Plaintiff Brown's mother struggled severely with her own grief to the point that she was no longer able to care for Plaintiff Brown. *Id.* The loss of his father destroyed Plaintiff Brown's family and his relationship with his mother. *Id.* Because Plaintiff Brown lost not only his father, but the relationship with his mother as a

result of the EFP attack, Plaintiff Brown seeks an upward adjustment of $1,000,000, which is 33% of the children's award for deceased servicemembers.

### 5.   Plaintiff Kimberly Yarbrough

Plaintiff Kimberly Yarbrough requests an upward adjustment for solatium damages due to the lasting effects the death of her son, Private Barry Mayo ("Pvt. Mayo"), resulting from Defendant's conduct. Plaintiff Yarbrough experienced extreme emotional distress upon learning about Pvt. Mayo's attack and death. Alberstone Decl., Ex. 20. To this day, Plaintiff Yarbrough continues therapy and medication management because of the loss of her son. *Id.* It has also been difficult for her to maintain employment since the loss of her son because of the resulting anxiety and depression that still plays a large role in her life. *Id.*

As such, Plaintiff Yarbrough seeks an upward adjustment of $500,000, which is 10% of the parental award for deceased servicemembers. *See Valore* , *supra*, 700 F. Supp. 2d at 86 (allowing a 25% increase in award to the decedents sister because she had to be hospitalized for several nervous breakdowns); *see also Bova*, 15-CV-1074 (RCL), 2020 WL 2838582, at *9 (allowing an upward adjustment of 20% to a mother's solatium award in part because she "required hospitalization to alleviate her deteriorating mental condition").

## IV.   DAMAGES AVAILABLE TO SURVIVING U.S. SERVICEMEMBERS AND ESTATES OF DECEASED U.S. SERVICEMEMBERS

### A.   <u>Economic Losses</u>

The beneficiaries of the Estates are entitled to recover the present value of economic damages, including lost wages or income that the Decedents might reasonably have been expected to earn but for the wrongful death. *See e.g., Heiser*, 466 F. Supp. 2d 229. Survivors of attacks are also entitled to recover for economic losses resulting from injuries sustained during the attack as well. *Murphy*, 740 F. Supp. 2d at 77, 78.

Here, the Estate Plaintiffs[2] and Plaintiff Adam Egli[3] ("Sgt. Egli") request an award of economic loss damages. In support of this request, the Estate Plaintiffs and Plaintiff Egli hereby submit the economic analyses by Donald L. Frankenfeld that detail the economic losses suffered by the Estate Plaintiffs and Sgt. Egli as a result of Defendant's conduct. *See* Expert Report of Donald L. Frankenfeld attached to the Alberstone Decl. as Exhibit 1(b) ("Frankenfeld Rpt."). Mr. Frankenfeld is a Forensic Economist and Financial Expert with experience calculating economic damages. *See* Alberstone Decl., Ex. 1(c) ("Frankenfeld CV"). He has testified in complex civil matters in federal court as well as being retained in state law cases. *Id.* Mr. Frankenfeld has submitted reports for each of the nine Estate Plaintiffs, as well as Sgt. Egli detailing that, as a result of the deaths and injuries caused by Defendant, significant economic losses were incurred. Mr. Frankenfeld has calculated these damages using generally accepted analytical techniques commonly applied by economists for analyses such as this. The summary table of the economic losses of each Estate Plaintiff and Sgt. Egli are listed in Mr. Frankenfeld's report. They are also included with the listing of all damages for all Plaintiffs. *See* Alberstone Decl., Exhibit 1(a).

### B. <u>Pain and Suffering as a Result of Attack</u>

Sgt. Egli must be compensated for the pain and suffering he endured, and continues to endure, as a result of the EFP attack that caused his physical and PTSD-related injuries, which are extensively documented in the below-referenced reports.  Further, the Estates of decedents Sergeant Joseph Richard, III ("Sgt. Richard"), and Sergeant Jason Merrill ("Sgt. Merrill") must be compensated for the extreme pain and suffering endured by the decedents as a result of the EFP attacks which ultimately took their lives, as they survived in extreme pain and mental

---

[2] These include: Estate of Sergeant Howard Allen, Estate of Staff Sergeant Daniel Cuka, Estate of Staff Sergeant Herlem, Estate of Rudy Guerrero Mesa, Estate of William Thorne, Estate of Sergeant Jason L. Merrill, Estate of Sergeant First Class Scott Brown, Estate of Jonathan Edds, and Estate of Joseph Richard III.
[3] Plaintiff Adam Egli survived the attack and is pursuing personal injury claims in this case.

8

anguish during the attacks but before their eventual deaths. *See*, *e.g.*, *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F.Supp.2d 216, 262-74 (D.D.C. 2008); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp 2d 62, 69-10 (D.D.C. 1998); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 50-3 (D.D.C. 2001).

Damages available under the FSIA "may include . . . pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Because there exists no precise methodology used to calculate damages for pain and suffering, the trier of fact (in this case, the Court) has a significant amount of discretion in determining the amount of appropriate damages. *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53 (D.D.C. 2008). As noted above, courts in this District have developed a framework for awarding these damages based upon the deaths and grievous injuries in numerous historic bombing attacks: (i) the 1983 truck bombing of the U.S. Marine Corps barracks in Beirut, Lebanon (*see*, *e.g.*, *Peterson v. Islamic Republic of Iran (Peterson II)*, 515 F. Supp. 2d 25 (D.D.C. 2007); *Valore, supra*; (D.D.C. 2010)); (ii) the 1996 truck bombing of Khobar Towers, a housing complex for members of the U.S. Air Force in Khobar, Saudi Arabia (*see*, *e.g.*, *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006)); and (iii) the simultaneous 1998 truck bombings of U.S. embassies in Tanzania and Kenya (*see*, *e.g., Owens v. Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014)). FSIA cases arising out of subsequent terror attacks have awarded damages based on the framework developed in these cases (AKA, the "*Valore* survivor framework").

Under the *Valore* survivor framework, "individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as 'lasting and severe psychological pain'" are typically "granted a baseline award of $5 million." *Valore*, 700 F. Supp. 2d at 84 (quoting *Peterson II*, 515 F. Supp. 2d at 54). Upward departures to

9

$7.5–$12 million are merited "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Id.* Further, Courts have granted extraordinary awards in more extraordinary cases. *See, e.g.*, *Gates*, *supra*, 580 F. Supp. 2d at 74 (awarding $50 million in pain and suffering to estates of victims who were beheaded). When victims suffer psychological (but no physical) injuries as a result of a terrorist attack, Courts have typically awarded baseline awards of $1.5 million, *Peterson II*, 515 F. Supp 2d at 56, and have also departed from that figure when warranted. *See, e.g., Campuzano*, 281 F. Supp. 2d at 275 (awarding $7 million in damages to plaintiff who suffered severe psychological injuries, but no physical injuries, as a result of a terror attack).

Additionally, several cases have awarded damages for the victim's pain and suffering that occurred—as in the case of Sgt. Richard and Sgt. Merrill—between the attack and the victims' deaths shortly thereafter. In these cases, courts were influenced not only by the length of time that the victim endured physical suffering, but also by the victim's mental anguish from the knowledge that death was imminent. *Baker et al. v. Socialist People's Libyan Arab Jamahirya, et al.*, 775 F. Supp. 2d 48, 81-4 (D.D.C. March 30th, 2011). In *Pugh, supra*, an action was brought under the FSIA against Libya for the wrongful death, intentional infliction of emotional distress, and loss of consortium by estates and survivors of American passengers killed in the bombing of an airliner in Africa. 530 F. Supp. 2d at 219-62. The court there determined the appropriate awards to the passengers' estates, in addition to economic damages, was $18 million to each estate for the decedents'—intense although brief—pain, suffering, and death. *Id.*, 530 F. Supp. 2d at 263-4.

10

Notwithstanding the inherent difficulty and subjectivity involved in awarding damages based on the pain and suffering of a claimant, compensation is required once liability has been determined. *Weinstein v. Islamic Republic of Iran*, 172 F.Supp.2d 13, 22-3 (D.D.C. 2002). While the *Valore* survivor framework "constitutes useful guidance for FSIA courts" and "provides a starting point for a court . . .it is simply that—a starting point." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011). Further, EFP attacks are unique in nature, and cause injuries that are not entirely captured by the *Valore* survivor framework. In fact, EFP attacks produce the most catastrophic injuries suffered in modern combat. (*See*, Independent Medical Report of Francis Xavier McGuigan, MD, on Sgt. Richard and Sgt. Merrill ("McGuigan-RM Report"), attached as Exhibit 3(b) to the Declaration of Daniel Alberstone ("Alberstone Decl."), at 3.) Considering the role Traumatic Brain Injuries ("TBIs") play in EFP attacks, and the resulting PTSD suffered by survivors of such attacks (in this case, Sgt. Egli), as well as the other unique physical injuries caused by this weapon, Plaintiffs propose the following pain and suffering damages for Sgt. Egli, and the Estates of Decedents Sgt. Richard and Sgt. Merrill:

### 1. Surviving Servicemember Sergeant Adam Egli

Sgt. Egli was a 21-year old United States Army Sergeant when he was severely injured by an EFP blast on July 31, 2007. The resulting injuries, both acute and permanent, have caused Sgt. Egli enormous pain and suffering for over 14 years and counting. Independent Medical Report of Francis Xavier McGuigan, MD, on Sgt. Egli, attached to the Alberstone Decl. as Exhibit 3(a) (hereinafter "McGuigan-Egli Report"), at 1.

As an immediate result of the EFP blast, Sgt. Egli sustained an open right patella fracture, damage to his right patellar tendon, cartilage, and right quadricep, multiple shrapnel wounds to the face, neck and back, a Traumatic Brain Injury ("TBI"), barotrauma (i.e. excessive pressure)

11

to the ear. *Id.* Sgt. Egli's injuries required multiple surgeries—including one 2008 procedure to remove infectious shrapnel from his knee—after which he required the assistance of a wheelchair, crutches, and cane for the following two years, in order to remain ambulatory. *Id.*

Following Sgt. Egli's June 10, 2009 retirement from active duty and discharge, his TBI symptoms worsened and he developed severe Post Traumatic Stress Disorder. *Id.*, at 2; *see also*, Psychological Evaluation of Sara Erb Kleiman, Ph.D., attached to the Alberstone Decl. as Exhibit 2(a) (hereinafter "Kleiman-Egli Report"), at 1-2. His severe PTSD has caused him to suffer from headaches, depression, anxiety, persistent negative beliefs about himself and the world, reckless and self-destructive behavior, flashbacks, intrusive memories, irritability, regret, constant fear, repetitive nightmares, anger, survivor's remorse, anhedonia, and nightmares. McGuigan-Egli Rep. at 2-3; Kleiman-Egli Rep. at 2. Treatment for his PTSD has included hospitalization for suicidality, weekly supportive psychotherapy for approximately 9 months, several Eye Movement Desensitization and Reprocessing (EMDR) psychotherapy sessions, and several psychiatric medications, which he took for approximate five years. Kleiman-Egli Rep. at 1. Further, Sgt. Egli's profound PTSD caused severe marital strife and a separation from his wife that nearly ended in divorce, damaged his relationship with his two daughters, caused him to withdraw from a college program at Purdue University, and resulted in anger outbursts that resulted in punching holes in the walls. McGuigan-Egli Rep. at 2-3; Kleiman-Egli Report at 2.

Presently, as a result of his EFP-related injuries, Sgt. Egli continues to suffer from PTSD symptoms, including significant impairment in his marital and family relationships and friendships, considerable impairment in his ability to complete work tasks, and some impairment in his ability to complete household tasks. Kleiman-Egli Rep. at 3. When Dr. Kleiman asked him about his relationships with family and friends, he explained that they are "almost non-

existent". (*Id.*) He has difficulty concentrating, becomes easily frustrated and angry, further

straining his personal relationships. Vocational Evaluation of Scott Beveridge, Ph.D., on Sgt.

Egli ("Beveridge-Egli Rep."), attached to the Alberstone Decl. as Exhibit 2(c), at 1. Due to his

severe PTSD symptoms, Sgt. Egli cannot regularly sleep in the same bed as his wife, as he wakes

up in the middle of night from nightmares, swinging, yelling, and swearing. (*Id.* at 2.)

      Sgt. Egli also reported that work is much more difficult for him due to his PTSD

symptoms because he finds it very uncomfortable to be around other people and it takes

considerable effort to cope with his internal anxiety. Beveridge-Egli Rep. at 10; Kleiman-Egli

Rep. at 3. As Dr. Beveridge explained:

> It appears, given the available medical and psychological data, that
> efforts to provide vocational rehabilitation services would be
> difficult given his physical limitations, chronic and severe PTSD
> symptoms, some TBI symptoms, irritability, and ongoing
> psychological symptoms (e.g., Anxiety, Depression). I believe
> additional vocational rehabilitation efforts would not enable Mr.
> Egli to maintain full-time gainful employment at another
> competitive employer given his complex injuries and deficits.

Beveridge-Egli Rep. at 16-17. According to Dr. Kleiman, "it is substantially likely the case that

[Sgt.] Egli will need additional mental health care either to fully address his PTSD (to the degree

that it is possible) or to help him manage existing PTSD symptoms." Kleiman-Egli Rep. at 3.

His emotional and mental impairments are lifelong and permanent. Beveridge-Egli Rep. at 16

      Further, he continues to suffer from back pain, lingering pain due to shrapnel in his face,

neck, and back, hearing loss, tinnitus, and instability in the knee. McGuigan-Egli Rep. at 2-3.

Sgt. Egli gets exhausted easily and needs to take breaks. Beveridge-Egli Rep. at 1. Climbing

stairs, prolonged standing, and walking, are very difficult for him. *Id.*

      In light of Sgt. Egli's grievous physical injuries from which he continues to suffer to this

day, as well as the severe TBI/PTSD symptoms from which he will likely suffer in perpetuity,

Plaintiffs request this Court award Sgt. Egli pain and suffering damages in the amount of $30 million.

### 2. Deceased Servicemembers Sergeant Joseph Richard and Sergeant Jason Merrill

Both Sgts. Richard and Merrill were alive following the EFP attacks on their vehicles in Baghdad, Iraq, before they subsequently died due to injuries sustained from the EFP explosions. McGuigan-RM Rep. at 2.  Available scientific data indicates trauma victims experience pain and psychological trauma following clinical death for a period of time between two and 10 minutes. McGuigan-RM Rep. at 1-2.  For patients undergoing resuscitative efforts, the pain and psychological trauma are experienced for the period of resuscitative efforts and for an additional two to 10 minutes following cessation of those efforts.  McGuigan-RM Rep. at 2.

The EFP attack which took Sgt. Richard's life occurred at 4:45pm, on April 14, 2008. *See* Alberstone Decl., Exhibit 22 ("EOD Report") at 1.  Sgt. Richard was alive for approximately 75 minutes following the EFP attack that took his life. McGuigan-RM Rep. at 2; *see*, *also*, EOD Report, at 25-27 (noting Sgt. Richard "Died of Wounds" at 6:01pm).  As a result of the EFP attack, Sgt. Richard received "major traumatic shrapnel wounds to the lower back side of the body" (EOD Rep. at 27) and died from "blast fragmentation injuries."  Alberstone Decl., Ex. 13(b) at 4 (Death Certificate of Joseph Richard, noting cause of death).

The EFP attack which took Sgt. Merrill's life occurred on September 3, 2006. *See* Alberstone Decl., Exhibit 11(f) at 3 (Death Certificate of Jason Merrill noting date and cause of death). According to Sgt. Merrill's death certificate, he survived for several minutes following the blast, but ultimately succumbed to "[p]erforating ballistic injuries." *Id.*

With respect to Sgts. Richard and Merrill, and based on all the information above, both men suffered immense pain and unimaginable psychological terror in the time following the EFP

explosions until their subsequent deaths. McGuigan-RM Rep. at 4. As such, and consistent with

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F.Supp.2d 216, 262-74 (D.D.C. 2008),

Plaintiffs respectfully request this Court award $18 million in pain and suffering damages to the

estates of both Sgt. Richard and Sgt. Merrill.

## V.    PREJUDGMENT INTEREST

"It is within the Court's discretion to award plaintiffs prejudgment interest from the date

of the attack . . . until the date of final judgment." *Baker*, 775 F. Supp. 2d at 86 (citing *Pugh v.*

*Socialist People's Libyan Arab Jamahiriya*, 530 F.Supp.2d 216, 263 (D.D.C.2008)). Federal

Courts in the District of Columbia have awarded prejudgment interest in cases where the victims

"were delayed in recovering compensation for their injuries-including, specifically, where such

injuries result in targeted attacks perpetrated by foreign defendants." *Pugh*, 530 F.Supp.2d at

263; *see also In re Terrorist Attacks on September 11, 2001*, 03 CIV. 9848 GBD FM, 2012 WL

3090979, at *6 (S.D.N.Y. July 30, 2012), *report and recommendation adopted*, 03 MDL 1570

GBD FM, 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012).

"The decision to award prejudgment interest, as well as how to compute that interest,

rests within the discretion of the court, subject to equitable considerations." *Baker*, 775 F. Supp.

2d at 86. Mr. Frankenfeld also completed an analysis to determine the appropriate rate of

prejudgment interest for each of the non-economic damages (the solatium and pain and suffering

awards). *See* Frankenfeld Rpt. at 7-8. Mr. Frankenfeld calculated prejudgment interest

conservatively by using the average prime rate and using simple, rather than compound, interest

calculation methods. *Id.*

One factor for the calculation of prejudgment interest is different in this case than in past

FSIA cases. Many of the past FSIA cases have arisen out of a single event, such as the 2001

Terrorist Attacks or the 1983 Beirut Bombing Attack. However, here, the dates of death and

injury vary because each attack happened on a different day. As such, Mr. Frankenfeld has

adapted his calculations to assign the proper prejudgment interest rate for each Plaintiff based on

the date of the attack. *Id.*

Plaintiffs request that this Court award prejudgment interest in the amounts as calculated

by Mr. Frankenfeld in his expert report. A listing of all damages for all Plaintiffs, including Mr.

Frankenfeld's calculation of prejudgment interest is also available for the Court's reference. *See*

Alberstone Decl., Exhibit 1(a).

### VI.   PUNITIVE DAMAGES

FSIA plaintiffs may be awarded punitive damages. 28 U.S.C. § 1605A(c)(4). In

determining whether to assess punitive damages, courts have found that any such award "must

balance the concern that recurrent awards in case after case arising out of the same facts can

financially cripple a defendant, over-punishing the same conduct through repeated awards with

little deterrent effect, against the need to continue to deter the brutal actions of defendants in

planning, supporting and aiding the execution of terrorist attacks." *Est. of Bland v. Islamic

Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011) (internal quotations and citations

omitted). Courts in the past have accomplished this goal by holding that "the calculation of

punitive damages in subsequent related actions should be directly tied to the ratio of punitive to

compensatory damages set forth in earlier cases." *Id.* (citing *Philip Morris USA v. Williams*, 549

U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007)); *see also Murphy*, 740 F. Supp. 2d at 76. In

previous cases involving Defendant, such as the cases regarding the 1983 Beirut Barracks attack

and the 2001 September 11th Attacks, courts consistently apply the punitive damages ratio of

$3.44. *Valore*, 700 F.Supp.2d at 52; *Murphy*, 740 F. Supp. 2d at 82-83; *Est. of Bland v. Islamic

Republic of Iran*, 831 F. Supp. 2d at 158; *In re Terrorist Attacks on September 11, 2001*, 03 CIV.

16

9848 GBD FM, 2012 WL 3090979, at *5-6 (finding that "the 3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks").

Plaintiffs request that this Court apply the same punitive damages ratio of $3.44. The proposed aggregate compensatory award in this case is $352,222,217.00 (including prejudgment interest). Accordingly, applying compensatory to punitive damage ratio of 1:3.44, the requested total amount of punitive damages is $1,211,644,426.48.

## VII.   CONCLUSION

Based on the preceding, Plaintiffs respectfully move that this Court grant their Motion for Default Judgment as to Damages Pursuant to FRCP 55(b)(2) and award damages as listed in Exhibit 1(a) to the Alberstone Declaration as well as granting the request for punitive damages in the amount of $1,211,644,426.48.

Dated this 15th day of November 2021.                     Respectfully Submitted,

*/s/ Daniel Alberstone*
BARON & BUDD, P.C.
Daniel Alberstone
Elizabeth Smiley
Peter Klausner
15910 Ventura Boulevard
Suite 1600 Floor
Encino, CA 91436
(818) 839-2333 telephone
(214) 520-1181 facsimile
dalberstone@baronbudd.com
esmiley@baronbudd.com
pklausner@baronbudd.com

BARON & BUDD, P.C.
Russell W. Budd
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
(214) 521-3605 telephone
(214) 520-1181 facsimile
rbudd@baronbudd.com

THE DRISCOLL FIRM, P.C.

Paul W. Johnson
Christopher J. Quinn
211 N. Broadway, 40th Floor
St. Louis, MO 63102
(314) 932-3232 telephone
(314) 932-3233 facsimile
paul@thedriscollfirm.com
chris@thedriscollfirm.com

*/s/ John J. Driscoll*
THE DRISCOLL FIRM, LLC

John J. Driscoll, DC# MO0003
1311 Avenida Juan Ponce de Leon
6th Floor
San Juan, PR 00907
(314) 222-2605 telephone
(314) 932-3233 facsimile
john@jjlegal.com

*Attorneys for Plaintiffs*

18